# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMUEL J. LE MACKAY,<br><br>　　　Plaintiff,<br><br>　　v.<br><br>MARTIN O'MALLEY,<br>Commissioner of Social Security,[1]<br><br>　　　Defendant.<br>_____/ | Case No. 1:22-cv-01633-SKO<br><br>ORDER ON PLAINTIFF'S SOCIAL SECURITY COMPLAINT<br><br>(Doc. 1) |

## I.　INTRODUCTION

Plaintiff Samuel J. Le MacKay ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act (the "Act"), 42 U.S.C. § 1383(c). (Doc. 1.) The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[2]

## II.　BACKGROUND

Plaintiff was born on November 3, 1981, completed high school, and previously worked in

---

[1] On December 20, 2023, Martin O'Malley was named Commissioner of the Social Security Administration. *See* https://www.ssa.gov/history/commissioners.html. He is therefore substituted as the defendant in this action. *See* 42 U.S.C. § 405(g) (referring to the "Commissioner's Answer"); 20 C.F.R. § 422.210(d) ("the person holding the Office of the Commissioner shall, in [their] official capacity, be the proper defendant.").

[2] The parties have consented to the jurisdiction of the U.S. Magistrate Judge.  (*See* Doc. 10.)

management. (Administrative Record ("AR") 29, 75, 89, 101, 242, 286, 319, 329.) Plaintiff filed a claim for SSI on April 25, 2019, alleging he became disabled on February 1, 2017, due to fibromyalgia, post-concussion syndrome, degenerative disc disease, anxiety, depression, migraines, insomnia, sciatica, and suicidal ideation. (AR 19, 89, 90, 101, 102, 131, 286.)

**A.    Relevant Evidence of Record[3]**

    **1.    Medical Evidence**

In February 2017, Plaintiff presented to a health clinic complaining of radiating left hip and back pain he experienced while doing yard work. (AR 1115.) An MRI of Plaintiff's thoracic spine performed in March 2017 showed a left paracentral disc extrusion at T8-T9 causing flattening of the left ventral cord. (AR 698.) The lumbar spine MRI showed mild senescent changes and mild facet arthropathy, with no definite nerve root impingement. (AR 698, 1204.) In July 2017, Plaintiff reported that his treatment with pain management was going well, and he was referred to physical therapy for low back pain. (AR 1251–52.)

In March 2018, Plaintiff returned to physical therapy following a lapse in care due to a change in insurance. (AR 627.) He complained of pain in his back and symptoms in both lower extremities. (AR 627.) Plaintiff reported having had "some improvement in symptoms in the past" with physical therapy. (AR 629.) He had trigger point injections in April 2018 with "good relief of pain." (AR 476.)

Plaintiff presented for a follow up appointment in May 2018 complaining of low back pain occasionally radiating to his left lower extremity. (AR 476.) He was assessed with a lumbar disc bulge and left lumbosacral myofascial pain and received trigger point injections. (AR 476.) In June 2018, Plaintiff received left transforaminal lumbar epidural steroid injections and reported "excellent relief of his lower back pain" lasting several weeks. (AR 481.) According to Plaintiff, following the procedure his pain decreased from an 8/10 to a level of 1/10. (AR 481.) Plaintiff presented for a physical therapy referral in July 2018. (AR 613–14, 1198–99.) His physical examination was normal, including normal range of motion and strength, no tenderness or swelling, and normal

---

[3] Because the parties are familiar with the medical evidence, it is summarized here only to the extent relevant to the contested issues.

neurological findings. (AR 614, 1199.)

In August 2018, Plaintiff requested a "note stating that he needs full time care" and that he "needs his wife and his mom to support him in his daily activities," as he is "limited in what he can do." (AR 603.) A physical examination was largely normal, except for some decreased range of motion in Plaintiff's back. (AR 604.)

An October 2018 physical therapy progress report noted "significant improvements" in Plaintiff's ability to squat and standing tolerance, with continued restrictions in lumbar spine mobility, and additional physical therapy was recommended. (AR 594, 1153.) He reported having less pain in his back, having not driven his wife to town as is customary, and that he stopped taking pain medication. (AR 469, 594, 1153.)

Plaintiff received another round of left transforaminal lumbar epidural steroid injections in November 2018, reporting "excellent pain relief," with pain levels decreasing to 2/10 from 9–10/10. (AR 490.) In December 2018, Plaintiff reported "feeling good" with no pain and tolerated physical therapy well. (AR 468.) Later that same month, he stated he had not been keeping up with his home exercise program due to illness, but that his back was "not doing too bad." (AR 470.)

In January 2019, Plaintiff was discharged from physical therapy, having met most of his functional goals and demonstrating normal range of motion in his lumbar spine. (AR 472.) Plaintiff presented for appointments in February, April, June, and July 2019. (AR 548–49, 559–60, 575–76, 585.) His physical examinations were normal, including normal musculoskeletal and neurological findings. (AR 549, 560, 575–76, 585.) Plaintiff again received left transforaminal lumbar epidural steroid injections at L5, S1 in June 2019. (AR 510.) He reported 30-40% continued pain relief from the injections. (AR 510.)

In July 2019, Plaintiff presented for a comprehensive internal medicine evaluation by Roger Wagner, M.D. (AR 493–98.) On examination, Plaintiff easily got up from his chair, walked at normal speed, bent at the waist, took his shoes off and on, and had good dexterity. (AR 495.) He walked easily and at a normal speed, with no assistive device. (AR 495–96.) Straight leg raise was negative, and motion, strength, sensation, respiratory function, and neurological function were normal. (AR 496–97.) Dr. Wagner deemed findings on a trigger point examination "of limited

utility," and deemed Plaintiff's alleged symptoms of post-concussion syndrome and fibromyalgia "vague." (AR 497.)

In November 2019, Plaintiff presented for a routine follow-up appointment to evaluate "consistent back pain." (AR 812–13.) He complained of moderate aching to sharp shooting pain in his entire back, radiating down both arms and both legs. (AR 813.) The pain was relieved by rest and pain medication, aggravated by physical activity, and there had been no improvement with physical therapy. (AR 813.) Plaintiff reported that his pain has worsened and requested an updated MRI. (AR 813.) On examination, tenderness was reported to palpation of spinous processes in cervical, thoracic and lumbar areas, and the straight leg test was positive bilaterally. (AR 813.)

In December 2019, a physical examination showed "[n]ormal kyphosis of upper spine and flattened lordosis of lower spine," with reported tenderness to palpation of spinous processes in cervical, thoracic and lumbar areas, and positive straight leg test bilaterally. (AR 798–99.) Plaintiff attended a follow up appointment in January 2020. (AR 793–94.) He continued to complain of cervical, thoracic, and lumbar pain, and also headaches. (AR 793–94.) The provider prescribed medication for Plaintiff's back pain and ordered aquatic physical therapy per Plaintiff's request. (AR 794.) Physical therapy was again recommended for Plaintiff's back pain in February 2020, and a physical examination showed decreased range of motion. (AR 787, 788.) Later that month, a physical therapy examination assessment reported decreased strength and mobility. (AR 646–47.)

A March 2020 provider note reported that Plaintiff has "repeatedly failed to participate in physical therapy" and was "requesting education on stretches and exercises today so that he can perform therapy at home for himself." (AR 768.) A physical examination showed "[f]lattened lordosis of lumbar spine," reported tenderness to spine with palpation, and decreased range of motion. (AR 769.)

In May 2020, an MRI of Plaintiff's lumbar spine showed degenerative disc disease at L5-S1, with no central canal stenosis or neural foraminal narrowing. (AR 698–99, 938.) Plaintiff's thoracic spine MRI showed left paracentral disc protrusions, with the largest 1 cm left paracentral disc protrusion seen at T8-T9; significant deformity of the left ventral thoracic cord at T8-T9 level, slightly worsening compared to previous exam; no evidence of cord edema or myelomalacia; and

no significant thoracic bony central canal or neural foraminal stenosis was noted. (AR 699, 937–38.) That month Plaintiff exhibited an antalgic gait, decreased range of motion, reduced strength, and positive Spurling's Test and Lhermitte Sign. (AR 750.)

In July 2020, Plaintiff presented for a follow up appointment. (AR 714–15.) On physical examination, Plaintiff exhibited normal gait, but decreased range of motion and reduced strength. (AR 715.) Spurling's Test and Lhermitte Sign were both positive. (AR 715.)

Plaintiff reported effective pain management from topical lidocaine in August 2020. (AR 707.) His physical examination demonstrated antalgic gait, diminished strength and range of motion with rotation, flexion and extension of neck and back secondary to pain. (AR 704.) He exhibited tenderness to his lumbar and thoracic vertebrae, with a positive tripod bilaterally. (AR 704.)

Plaintiff presented for a physical examination in November 2020. (AR 965–66.) He exhibited normal range of motion and strength, with no tenderness or swelling, and normal neurological findings. (AR 966.) That same month, Plaintiff demonstrated tenderness to his vertebrae and diminished flexibility to his cervical spine. (AR 961.)

Plaintiff reported worsening back and neck pain in January 2021. (AR 937.) In March 2021, Plaintiff expressed an interest in resuming physical therapy for back and right shoulder pain and showed a reduced range of motion. (AR 1128.) He reported that medicine "helped some but not very much." (AR 1150.)

**2.     Opinion Evidence**

Following his examination of Plaintiff in July 2019, consultative examiner Dr. Wagner opined that Plaintiff was capable of medium work with frequent climbing, stooping, and crouching. (AR 497–98.)

In August 2019, State agency physician A. Nasrabadi, M.D., assessed Plaintiff's physical residual functional capacity (RFC)[4] and found Plaintiff was capable of medium work. (AR 96–97.)

---

[4] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. TITLES II & XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, Social Security Ruling ("SSR") 96-8P (S.S.A. July 2, 1996). The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id*. "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and

Upon reconsideration in October 2019, State agency physician R. Fast, M.D., affirmed the finding of medium work capability. (AR 109–110.)

In February 2021, Mick Hilvers, D.N.P., completed mental and physical medical source statements. (AR 854–55, 857–60.) D.N.P. Hilvers opined that Plaintiff had limitations in maintaining attention and concentration for extended periods of time; performing activities within a schedule, maintaining regular attendance, and being punctual and within customary tolerances; and working in coordination with or in proximity to others without being distracted by them. (AR 854.) According to D.N.P. Hilvers, Plaintiff was expected to miss more than four workdays a month due to his impairments. (AR 855.) With respect to Plaintiff's physical limitations, D.N.P. Hilvers opined that Plaintiff could sit for only 30 minutes at a time and for less than two hours total in a day, stand for only 15 minutes at a time and for less than two hours total in a day, occasionally lift less than 10 pounds and rarely lift 10 pounds, rarely twist, stoop, crouch, squat, or climb stairs, and would need to take unscheduled breaks approximately every 30 minutes. (AR 858–59.)

**B.    Administrative Proceedings**

The Commissioner denied Plaintiff's application for benefits initially on August 6, 2019, and again on reconsideration on October 9, 2019. (AR 19, 89–99, 101–112.) Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 137–39.) The ALJ conducted a hearing on May 4, 2021. (AR 36–74.) Plaintiff appeared at the hearing with his attorney representative and testified as to his alleged disabling conditions and work history. (AR 42–69.) A Vocational Expert ("VE") also testified at the hearing. (AR 69–74.)

**C.    The ALJ's Decision**

In a decision dated August 2, 2021, the ALJ found that Plaintiff was not disabled. (AR 19–30.) The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 416.920(a)(4). (AR 21–30.) The ALJ determined that Plaintiff had not engaged in substantial gainful activity since April 25, 2019, the application date (step one). (AR 21.) At step two, the ALJ found Plaintiff's following combination of impairments to be severe: fibromyalgia, degenerative disc disease (lumbar, thoracic,

---

'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

6

and cervical spine), obstructive sleep apnea, and asthma. (AR 21–23.) Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (step three). (AR 23.)

The ALJ then assessed Plaintiff's RFC and applied the RFC assessment at steps four and five. *See* 20 C.F.R. § 416.920(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity . . . . We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps."). The ALJ determined that Plaintiff had the RFC:

> to perform light work as defined in 20 CFR [§] 416.967(b) except as follows. He can never climb ladders, ropes, or scaffolds. [Plaintiff] can no more than frequently climb ramps and stairs, stoop, balance, kneel, crouch, and crawl. [Plaintiff] can tolerate occasional exposure to pulmonary irritants such as dusts, gases, fumes, chemicals, and poorly ventilated areas. [Plaintiff] can tolerate occasional exposure to hazards such as unprotected heights and dangerous moving machinery. [Plaintiff] can understand, remember, and carry out instructions for simple, routine, repetitive tasks, and can make simple, work-related decisions.

(AR 23–28.) Although the ALJ recognized that Plaintiff's impairments "could reasonably be expected to cause some of the alleged symptoms[,]" they rejected Plaintiff's subjective testimony as "not entirely consistent with the medical evidence and other evidence in the record . . . ." (AR 24.)

The ALJ determined that, given his RFC, Plaintiff could not perform his past relevant work (step four), but he could perform a significant number of other jobs in the local and national economies, specifically Cashier II, Bench Assembler, and Sub Assembler, as testified by the VE (step five). (AR 29–30. See also AR )

Plaintiff sought review of this decision before the Appeals Council, which denied review on September 9, 2022. (AR 4–10.) Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. § 416.1481.

### III.   LEGAL STANDARD

#### A.   Applicable Law

An individual is considered "disabled" for purposes of disability benefits if [they are] unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

7

to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). However, "[a]n individual shall be determined to be under a disability only if [their] physical or mental impairment or impairments are of such severity that he is not only unable to do [their] previous work but cannot, considering [their] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

"The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520); *see also* 20 C.F.R. § 416.920. The Ninth Circuit has provided the following description of the sequential evaluation analysis:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity. If so, the claimant is not disabled. If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments. If not, the claimant is not disabled. If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, [a]pp. 1. If so, the claimant is automatically presumed disabled. If not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing [their] past relevant work. If so, the claimant is not disabled. If not, the ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to perform any other substantial gainful activity in the national economy. If so, the claimant is not disabled. If not, the claimant is disabled.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see, e.g.*, 20 C.F.R. § 416.920(a)(4) (providing the "five-step sequential evaluation process" for SSI claimants). "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520); 20 C.F.R. § 416.920.

"The claimant carries the initial burden of proving a disability in steps one through four of the analysis." *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)). "However, if a claimant establishes an inability to continue [their] past work, the burden shifts to the Commissioner in step five to show that the claimant can perform other substantial gainful work." *Id.* (citing *Swenson*, 876 F.2d at 687).

**B.   Scope of Review**

"This court may set aside the Commissioner's denial of [social security] benefits [only] when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record

8

as a whole." *Tackett*, 180 F.3d at 1097 (citation omitted). "Substantial evidence . . . is 'more than a mere scintilla,'" and means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). *See also Ford v. Saul*, 950 F.3d 1141, 1154 (9th Cir. 2020).

"This is a highly deferential standard of review . . . ." *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009). "The ALJ's findings will be upheld if supported by inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citation omitted). Additionally, "[t]he court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." *Id.*; *see, e.g.*, *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) ("If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner." (citations omitted)).

Nonetheless, "the Commissioner's decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'" *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)). "Rather, a court must 'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055–56 (9th Cir. 2006)). Harmless error "exists when it is clear from the record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006)). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted).

## IV. DISCUSSION

Plaintiff asserts two claims of error: 1) that the RFC was not supported by substantial evidence because the ALJ independently interpreted medical records without the aid of a medical

expert rather than further developing the record; and 2) that the ALJ failed to offer clear and convincing reasons for rejecting Plaintiff's subjective symptom complaints. (Doc. 12.) The Court agrees that the ALJ did not fully develop the record and instead improperly interpreted medical records on their own in formulating the RFC, and will remand for further proceedings on that basis.

**A.     The ALJ Erred by Independently Interpreting Medical Records and Failing to Fully Develop the Record**

   **1.     Legal Standard**

      a.     RFC

The RFC is "the most [one] can still do despite [his or her] limitations" and represents an assessment "based on all the relevant evidence." 20 C.F.R. § 416.945(a)(1). The RFC must consider all of the claimant's impairments, including those that are not severe. 20 C.F.R. § 416.920(e), 416.945(a)(2); Social Security Ruling ("SSR") 96–8p.

A determination of residual functional capacity is not a medical opinion, but a legal decision that is expressly reserved for the Commissioner. *See* 20 C.F.R. §§ 414.927(d)(2) (RFC is not a medical opinion), 414.946(c) (identifying the ALJ as responsible for determining RFC). "[I]t is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity." *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001). In doing so, the ALJ must determine credibility, resolve conflicts in medical testimony and resolve evidentiary ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039–40 (9th Cir. 1995).

"In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record such as medical records, lay evidence and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins*, 466 F.3d at 883. *See also* 20 C.F.R. § 414.945(a)(3) (residual functional capacity determined based on all relevant medical and other evidence). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).

b.     Independent Review of Medical Evidence

Although ALJs do not have unbridled discretion to do so, an ALJ is almost always tasked with performing some independent review of medical evidence and translate the same into functional terms. This is consistent with the ALJ's role as characterized by the Ninth Circuit. *See Rounds v. Comm'r of Soc. Sec.*, 807 F.3d 996, 1006 (9th Cir. 2015) ("[T]he ALJ is responsible for translating and incorporating clinical findings into a succinct RFC."). For example, there is always a gap in time between the State agency physician's review at the initial/reconsideration levels and the ALJ's subsequent hearing decision. Claimants routinely continue pursuing care in the interim thereby generating new medical records. *See de Hoog v. Comm'r of Soc. Sec.*, No. 2:13–CV–0235–KJN, 2014 WL 3687499, at *7 (E.D. Cal. July 23, 2014) (explaining that "[i]n virtually every case further evidence is received after the [S]tate agency physicians render their assessments—sometimes additional evidence and records are even received after the ALJ hearing. For that very reason, the ALJ is tasked with considering the evidence in the record as a whole.").

If the mere passage of time and presence of additional medical evidence in the record established ambiguity, a consultative examination would be required in every case. Yet the regulations provide that the agency may obtain a consultative examination to resolve evidentiary ambiguity or insufficiency, not that an ALJ must do so in every case. *See* 20 C.F.R. § 414.919; *Meadows v. Saul*, 807 F. App'x 643, 647 (9th Cir. 2020) (unpublished) (noting there "is always some time lapse between a consultant's report and the ALJ hearing and decision, and the Social Security regulations impose no limit on such a gap in time.").

While there are no bright line rules circumscribing the ALJ's authority to interpret medical evidence independently, some courts, including this one, have found that an ALJ errs in independently reviewing medical evidence when the evidence concerns: 1) raw medical data such as complex imaging findings or laboratory testing results; 2) worsening of underlying impairments; or 3) development of novel impairments. *See, e.g., Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (ALJ formulated claimant's residual functional capacity based on magnetic resonance images without the benefit of any medical opinion about the functional limitations attributable to the impairments depicted in the images); *Goodman v. Berryhill*, No. 2:17-CV-01228 CKD, 2019 WL

11

79016, at *5 (E.D. Cal. Jan. 2, 2019) (finding that the ALJ erred in adopting state agency consultants' opinions which were rendered before "plaintiff sustained a fall in November 2014" and before "an April 2015 MRI of the lumbar spine [which] showed L1 compression deformity with worsened kyphosis . . . ."); *Stevenson v. Colvin*, No. 2:15-CV-0463-CKD, 2015 WL 6502198, at *4 (E.D. Cal. Oct. 27, 2015) (holding that the ALJ erred in adopting the functionality opinion of a non-examining state agency physician, an opinion which pre-dated "plaintiff's treating records regarding the progression of his spinal impairments, which were developed after the date of Dr. Pancho's opinion.").

### c. Duty to Develop the Record

A claimant bears the burden of providing medical and other evidence that support the existence of a medically determinable impairment. *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998) ("At all times, the burden is on the claimant to establish her entitlement to disability insurance benefits."). Indeed, it is "not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so." *Yuckert*, 482 U.S. at 146 n.5.

Nevertheless, as the Ninth Circuit Court of Appeals has also explained:

> The ALJ in a social security case has an independent duty to fully and fairly develop the record and to assure that the claimant's interests are considered. This duty extends to the represented as well as to the unrepresented claimant. When the claimant is unrepresented, however, the ALJ must be especially diligent in exploring for all the relevant facts . . . The ALJ's duty to develop the record fully is also heightened where the claimant may be mentally ill and thus unable to protect her own interests. Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to conduct an appropriate inquiry.

*Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir.2001) (citations and quotation marks omitted). *See also Celaya v. Halter*, 332 F.3d 1177, 1183 (9th Cir. 2003). In short, "[a]n ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459–60 (9th Cir. 2001) (citing *Tonapetyan*, 242 F.3d at 1150).

"The ALJ may discharge this duty in several ways, including: subpoenaing the claimant's

physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record." *Id*. However, " the ALJ does not have to exhaust every possible line of inquiry in an attempt to pursue every potential line of questioning. The standard is one of reasonable good judgment." *Stevenson*, 2015 WL 6502198, at *3 (quoting *Hawkins v. Chater*, 113 F.3d 1162, 1168 (10th Cir. 1997)).

**2.     Analysis**

State agency physicians Nasrabadi and Fast reviewed Plaintiff's medical file at the initial and reconsideration levels in August and October 2019, respectively, and concluded that Plaintiff could perform medium work with no other limitations. (AR 96–97, 109–110.) Their review included clinical records and physical therapy notes from May to October 2019, as well as consultative examiner Dr. Fast's July 2019 opinion that Plaintiff could perform medium work with postural limitations (AR 497–98). (AR 90–92, 102–104.) The ALJ found all of these opinions "unpersuasive" because the record demonstrated that Plaintiff was "more limited" based on "subsequent evidence." (AR 27, 28.) No medical expert reviewed the subsequent evidence, *i.e.*, that dated after October 2019. Instead, the ALJ, based on an independent interpretation of that evidence, rejected a "medium" exertional level as opined, and instead formulated an RFC that provided for the performance of less than a full range of "light" work. (AR 23–24.) In so doing, the ALJ erred.

Plaintiff's post-October 2019 medical records include evidence of the worsening of his existing back impairments and complex imaging findings, on which the ALJ may not independently rely. *See, e.g., Nguyen*, 172 F.3d at 35; *Goodman*, 2019 WL 79016, at *5; *Stevenson*, 2015 WL 6502198, at *4. The medical records that were reviewed by the State agency physicians documented normal range of motion, normal strength, no tenderness, and negative straight leg test (AR 472, 496–97, 549, 560, 575–76, 585, 614, 1199), whereas subsequent physical examination findings showed tenderness to palpation, decreased range of motion, decreased strength, positive straight leg test, positive Spurling's Test, and positive Lhermitte Sign (AR 646–47, 704, 715, 750, 787, 788, 769, 798–99, 813, 961, 1128). The State agency physicians also did not review the thoracic spine MRI performed in May 2020 noting "worsening" significant deformity of the left ventral thoracic cord at

T8-T9 level when compared to previous exam. (AR 699, 937–38.) They did not review a May 2020 lumbar spine MRI noting degenerative disc disease at L5-S1 (AR 698–99, 938), whereas the previous exam noted only mild senescent changes and facet arthropathy (AR 698, 1204).

The ALJ noted Plaintiff's back impairments were treated conservatively and determined, based on the above-described objective evidence developed after the State agency opinions, that Plaintiff had become "more limited" and rendering those opinions under restrictive. However, the extent of Plaintiff's physical deterioration, as indicated by the post-October 2019 medical evidence, and the effect of that deterioration on his functional capabilities, are "issue[s] beyond the scope of the ALJ's expertise to address independently." *Jones v. Kijakazi*, No. 1:20-CV-01554-GSA, 2022 WL 95219, at *7 (E.D. Cal. Jan. 10, 2022). In addition, the clinical significance and associated functional deficits potentially attributable to a worsening thoracic cord deformity, as demonstrated by the May 2020 MRI results, were also matters beyond the scope of the ALJ's expertise to address independently. *See Howell v. Kijakazi*, No. 20-CV-2517-BLM, 2022 WL 2759090, at *7 (S.D. Cal. July 14, 2022) (MRIs, radiological studies, and X-rays "generally reflect only the findings, impressions, and medical diagnoses, which are difficult for a lay person to interpret."); *Escudero v. Comm'r of Soc. Sec.*, No. 1:18-CV-01136-EPG, 2019 WL 4917634, *2 (E.D. Cal. Oct. 4, 2019) (finding "descriptions of medical documents post-dating the physician's opinions appear to be very medical in nature and not susceptible to a lay understanding.").

The record does contain a medical opinion that post-dates the State agency physician's review and the May 2020 spinal imaging. In February 2021, Mick Hilvers, D.N.P., completed a physical medical source statement and opined that Plaintiff could sit for only 30 minutes at a time and for less than two hours total in a day, stand for only 15 minutes at a time and for less than two hours total in a day, occasionally lift less than 10 pounds and rarely lift 10 pounds, rarely twist, stoop, crouch, squat, or climb stairs, and would need to take unscheduled breaks approximately every 30 minutes. (AR 858–59.) The ALJ found this opinion to be unpersuasive, unsupported by treatment notes, and inconsistent with the record as a whole.[5] (AR 28.) Because the ALJ rejected D.N.P. Hilvers' opinion and the record does not contain an opinion or interpretation of the functional

---

[5] Plaintiff does not challenge the ALJ's decision to discount D.N.P Hilvers' opinion.

14

limitations resulting from the post-October 2019 examination and imaging results, the ALJ's duty to further develop the record was triggered, warranting either a consultative examination or medical expert opinion by a physician who had access to Plaintiff's medical records through, at minimum, the May 2020 lumbar and thoracic imaging. *See Banks v. Barnhart*, 434 F. Supp. 2d 800, 805 (C.D. Cal. 2006) ("An ALJ cannot arbitrarily substitute his own judgment for competent medical opinion . . . and must not succumb to the temptation to play doctor and make . . . independent medical findings."); *see also Tonapetyan*, 242 F.3d at 1151 (9th Cir. 2002) (reversing and remanding for further proceedings where the ALJ's RFC determination was not based on a fully developed record).

In sum, because the record was inadequate to establish Plaintiff's current function-by-function capabilities, the ALJ had a duty to further develop the record. The failure to do so was erroneous. *See Mack v. Saul*, No. 1:18-CV-01287-DAD-BAM, 2020 WL 2731032, at *2 (E.D. Cal. May 26, 2020) (duty to develop where the ALJ improperly determined RFC after considering MRIs and radiological studies absent a doctor's opinion regarding the effect on plaintiff's ability to work on a function-by-function basis); *see also Howell*, 2022 WL 2759090, at *10 ("Because the record was inadequate to establish Plaintiff's current function-by-function capabilities, the ALJ had a duty to further develop the record. His failure to do so was an error."); *Escudero*, 2019 WL 4917634, *2. The error was not harmless because it resulted in the ALJ giving the VE an incomplete hypothetical. "Hypothetical questions asked of the vocational expert must 'set out all of the claimant's impairments.'" *Lewis v. Apfel*, 236 F.3d 503, 517 (9th Cir. 2001) (quoting *Gamer v. Sec. of Health and Human Servs.*, 815 F.2d 1275, 1279 (9th Cir. 1987)). "If the record does not support the assumptions in the hypothetical, the vocational expert's opinion has no evidentiary value." *Id.*

Remand is appropriate for the ALJ to develop the record with a medical opinion from a physician who reviews all medical evidence in the administrative record. *See Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) ("Generally when a court . . . reverses an administrative determination, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.").

**B.     The Court Declines to Determine Plaintiff's Remaining Assertion of Error**

As the Court finds that remand is appropriate for all pertinent medical evidence to be evaluated by a medical expert, not just by the ALJ, the Court does not reach Plaintiff's additional assertion of error directed to his subjective symptom complaints, which were discounted in part because they was inconsistent with and/or unsupported by that evidence. *See Hiler v. Astrue*, 687 F.3d 1208, 1212 (9th Cir. 2012) ("Because we remand the case to the ALJ for the reasons stated, we decline to reach [plaintiff's] alternative ground for remand."); *see also Augustine ex rel. Ramirez v. Astrue*, 536 F. Supp. 2d 1147, 1153 n.7 (C.D. Cal. 2008) ("[The] Court need not address the other claims plaintiff raises, none of which would provide plaintiff with any further relief than granted, and all of which can be addressed on remand.").

### V.     CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence and is therefore VACATED, and the case is REMANDED to the ALJ for further proceedings consistent with this Order.  The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff Samuel J. Le MacKay and against Defendant Martin O'Malley, Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **January 16, 2024**                         /s/ *Sheila K. Oberto*                
                                                                    UNITED STATES MAGISTRATE JUDGE

16